UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) )))))) | 3:18 CR100 (AWT) <br> 3:18mJ 792 SALM |

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through Natasha Freismuth, its

undersigned counsel, respectfully submits this *ex parte* Application for an Order pursuant to 18

U.S.C. § 2703(d). The Order would require Verizon and AT&T (the Service Providers), to

disclose certain records and other information pertaining to the cellular telephone assigned call

number **475-238-1383** (serviced by Verizon) and the cellular telephone assigned call number

**203-500-1728** (serviced by AT&T) as described in Part I of Attachment A for the dates set forth

in Attachment B. The records and other information sought are described in Part II of

Attachment A to the proposed Order. In support of this Application, the United States asserts:

LEGAL BACKGROUND

1.      The United States may use a court order issued under 18 U.S.C. § 2703(d) to

require a provider of electronic communication service to disclose records or other information

pertaining to a subscriber or customer of such service, not including the contents of any

communications. Cellular service providers are providers of an electronic communications

service, as defined in 18 U.S.C. § 2510(15). Accordingly, the United States may use a court

order issued under 18 U.S.C. § 2703(d) to require the Service Providers to disclose the items

described in Part II of Attachment A, which are "record[s] or other information pertaining to a subscriber to or customer of such service." 18 U.S.C. § 2703(c)(1).

2.     This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3.     A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this Application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Attachment A for the dates set forth in Attachment B are relevant and material to an ongoing criminal investigation.

## FACTS ABOUT THE ONGOING CRIMINAL INVESTIGATION

4.     The United States is investigating drug distribution by TIMOTHY ESTRIDGE. The investigation concerns possible violations of Title 21, United States Code, Section 841(a)(1).

5.     On March 9, 2018, the Honorable United States Magistrate Judge Robert A. Richardson issued a criminal complaint and arrest warrant for TIMOTHY ESTRIDGE based on violations of Title 21, United States Code, Section 841(a)(1). On April 3, 2018, ESTRIDGE was arrested and presented before the Honorable United States Magistrate Judge Sarah A. L. Merriam. On May 10, 2018, a Grand Jury in Hartford, Connecticut returned a one-count indictment charging ESTRIDGE with distribution of heroin in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1)(C).   On May 11, 2018, ESTRIDGE was arraigned before the Honorable

United States Magistrate Judge Donna F. Martinez.

6.      As reflected in the affidavit supporting the arrest warrant and criminal complaint,

law enforcement officers have been investigating ESTRIDGE and other individuals, for the

unlawful distribution of heroin and/or fentanyl in and around Wallingford, Connecticut, since

December 2017.

7.      On December 16, 2017, members of the Wallingford Police Department (WPD)

and medical personnel responded to a home in Wallingford, Connecticut, in connection to the

report of an untimely death of a thirty-eight-year-old male.  Wallingford Police Dispatch

received a 9-1-1 phone call from a male voice.  The caller stated that he thought his friend was

dead.  The caller did not leave his name or contact information and was not on scene when

emergency personnel arrived.

8.      Upon arrival, officers located a thirty-eight-year-old male, whose name and

identity are known to the undersigned Affiant and is hereinafter referred to as VICTIM #1.

VICTIM #1 was pronounced dead at the scene.  From the scene, officers recovered evidence of

illicit drug use including a small plastic baggie with approximately eight (8) suspected

oxycodone pills, a glass dish with white powder residue, a broken credit card, prescription pill

bottles, piece of wax folds commonly used for heroin, and a used plastic syringe.  Officers also

found evidence indicating VICTIM #1 possessed an iPhone X, but officer did not find this phone

at the scene.  Based on the discovery of the above referenced drug and non-drug evidence,

investigators believe that the death was the result of a suspected heroin, fentanyl (or otherwise

opiate) drug overdose.

9.      The medical examiner subsequently determined that VICTIM #1 died as a result of acute intoxication caused by a combination of heroin, fentanyl, oxycodone, alprazolam, amphetamine, and ethanol.

10.      During the course of the investigation, investigators obtained a copy of the 9-1-1 call made from VICTIM #1's home on the night VICTIM #1 was discovered deceased.  The voice of the male caller on the 9-1-1 recording strongly resembles ESTRIDGE's voice.  Two officers who have had numerous police involvement with ESTRIDGE in the past and are familiar with his voice identified the caller as ESTRIDGE.  ESTRIDGE is a cousin of VICTIM #1.

11.      During the week of December 26, 2017, the WPD arrested Jason DELBUONO for possession of narcotics after discovering heroin during a motor vehicle stop.  After being advised of his rights, DELBUONO agreed to waive his rights and speak with investigators.[1]

12.      Law enforcement officers subsequently interviewed DELBUONO.  The interview was audio and visually recorded.  DELBUONO informed investigators that he has been in a dating relationship with ESTRIDGE's mother, GRITZBACH, for several years.  He related that in the early afternoon on December 16, 2017, he was at the residence in Wallingford that he shares with GRITZBACH, ESTRIDGE, and another individual named GENDRON, when VICTIM #1 picked ESTRIDGE up.  DELBUONO explained that ESTRIDGE goes to Hartford daily to purchase heroin.  He related that ESTRIDGE commonly obtains rides to Hartford from other individuals or he and GRITZBACH will drive up with him.  DELBUONO related that on December 16, 2017, he believed ESTRIDGE obtained a ride from VICTIM #1 to Hartford to purchase heroin.

---

1 DELBUONO is a convicted felon.  He has numerous prior convictions including violation of a protective order, reckless endangerment in the second degree, resisting arrest, threatening in the second degree, larceny in the sixth degree, criminal trespass, and criminal mischief.

13.     DELBUONO stated that at approximately 5:00 P.M. that evening, he and GRITZBACH were home when they observed ESTRIDGE walking around, acting as if he was "high." DELBUONO explained that ESTRIDGE's behavior was typical of how he acted after he used heroin. DELBUONO stated that at approximately 9:00 P.M., ESTRIDGE began acting strange. He began making statements such as "I shouldn't have left him alone," which DELBUONO explained was a reference to ESTRIDGE leaving VICTIM #1 alone at his house after they returned form Hartford. DELBUONO stated that he believed that ESTRIDGE and VICTIM #1 had used heroin together at VICTIM #1's house upon returning from Hartford. DELBUONO related that ESTRIDGE proceeded to have GRITZBACH bring him to VICTIM #1's house at approximately 9:30 P.M. to check on him.

14.     Upon arriving at VICTIM #1's house, ESTRIDGE discovered VICTIM #1 unresponsive within. DELBUONO stated that ESTRIDGE told him later that evening that he called 9-1-1, but he left the house before the police arrived. DELBUONO also related that ESTRIDGE told him that he thought VICTIM #1 was buying heroin for one of his friends, not himself, when they went up to Hartford earlier that afternoon.

15.     DELBUONO also stated to investigators that ESTRIDGE took VICTIM #1's iPhone from the residence prior to leaving because ESTRIDGE feared investigators would discover communication regarding heroin between he and VICTIM #1. DELBUONO related that ESTRIDGE brought the phone back home and instructed his younger brother to discard the phone into a storm drain near their house in Wallingford. Subsequent searches of storm drains in the area of the residence yielded negative results.

16.     During the course of the investigation, officers received a phone call from J.H,[2] who is VICTIM #1's sister.  J.H. related that she and her husband met with ESTRIDGE on December 26, 2017, in Meriden, Connecticut, to speak about VICTIM #1.  J.H. stated that she recorded the conversation with ESTRIDGE on her cellular phone.

17.     During their recorded conversation, ESTRIDGE admitted to J.H. that he had found VICTIM #1 and called 9-1-1.  ESTRIDGE asserted that knew VICTIM #1 was "gone" and he did not know what to do. ESTRIDGE stated that he "was freaked out" and wound up going to a "psych ward" for three days after the death of VICTIM #1.  ESTRIDGE claimed that VICTIM #1 was very much against ESTRIDGE using heroin, or doing heroin, and ESTRIDGE claimed did not know VICTIM #1 had used the heroin.

18.     J.H. told ESTRIDGE she knew he had given VICTIM #1 heroin before. ESTRIDGE admitted to providing heroin to VICTIM #1 in the past and said it was in July and VICTIM #1 had wanted it for a friend.  During the conversation, J.H. asked ESTRIDGE about some text messages he had sent to VICTIM #1 that night. ESTRIDGE stated that they were about pills and drugs from the internet. ESTRIDGE said his mother dropped him off at VICTIM #1's house the evening of VICTIM #1's death and ESTRIDGE discovered him deceased upon entering.  During the conversation, J.H. asked ESTRIDGE about VICTIM #1's iPhone. ESTRIDGE told J.H. that he had picked the phone up to call 9-1-1 and tried to use it.  He stated that he left the house with the phone, but he was not the one who got rid of it.

19.     On February 9, 2018, law enforcement officers went to speak with DELBUONO at his residence in Wallingford, Connecticut.  Officers informed DELBUONO that they wanted to speak to him further regarding his relationship with ESTRIDGE.  DELBUONO stated that he has known ESTRIDGE for approximately ten (10) years.  DELBUONO acknowledged a

---

2 J.H.'s identity is known to the undersigned affiant.

previous statement he had made to officers that ESTRIDGE went to Hartford with VICTIM #1 the day that VICTIM #1 died from an overdose. DELBUONO stated that ESTRIDGE has used heroin almost every day since he has known him. He stated that he has used heroin with ESTRIDGE "on and off" for approximately seven (7) years. DELBUONO stated that ESTRIDGE goes up to Hartford every day to purchase heroin. He stated that ESTRIDGE comes back to Wallingford with "at least a bundle, sometimes a couple" bundles of heroin each time he goes to Hartford. DELBUONO stated that ESTRIDGE has a couple different heroin sources in Hartford from whom he buys heroin. He related that he drives up to Hartford frequently with ESTRIDGE to buy heroin.

20.     DELBUONO further explained that ESTRIDGE uses the heroin he buys in Hartford but also resells some of the heroin in order to support his habit. He stated that ESTRIDGE does not make a lot of money off the heroin he sells; he mostly supports his habit. DEULBUONO stated that ESTRIDGE sells to people in Wallingford, outside Wallingford, and also to "whoever he could sell to."

21.     Based on a review of (475) 238-1383's call history (a phone utilized by ESTRIDGE), investigators identified JUSTINE PETERSIMES as a likely heroin consumer. On February 22, 2018, officers contacted PETERSIMES via telephone and explained that they would like to speak to him regarding his relationship with ESTRIDGE. PETERSIMES agreed to meet with investigators later that evening.

22.     During the subsequent meeting, PETERSIMES stated that he had known ESTRIDGE for over ten years. He stated that he has not spoken to him in weeks or months. PETERSIMES stated that as long as he has known ESTRIDGE, ESTRIDGE has been a heroin user. He stated that ESTRIDGE has been going up to Hartford almost daily to purchase heroin

since he has known him.  PETERSIMES stated that he has gone to Hartford with ESTRIDGE to

purchase heroin "hundreds" of times over the ten years he has known him.  PETERSIMES stated

that if they went to Hartford together, he would always drive ESTRIDGE to Hartford to buy

heroin because ESTRIDGE did not have a car.  PETERSIMES said that he would often receive a

few bags to a bundle of heroin from ESTRIDGE in exchange for driving ESTRIDGE to Hartford

and back to Wallingford.  PETERSIMES stated that ESTRIDGE would typically get two to three

bundles of heroin and as many as three to five bundles of heroin each time he went to Hartford.

PETERSIMES stated that ESTRIDGE would "pick up" heroin for other people when they went

to Hartford.  PETERSIMES stated that ESTRIDGE knows many people in Wallingford and

provided the names of a few specific individuals.  PETERSIMES stated that he believes

ESTRIDGE goes up to Hartford every day to buy heroin.  He stated that ESTRIDGE always

brought more heroin back for other people other than himself.

      23.     PETERSIMES stated that traveling to Hartford with ESTRIDGE to purchase

heroin was always a "hassle."  He stated that ESTRIDGE would always stop at "bodega" to sell

items such as soda, which he would buy with food stamps, to get money to buy more heroin.

PETERSIMES stated that when they came back from Hartford, he would always drop

ESTRIDGE off at his house.  He stated that he has never driven ESTRIDGE to sell heroin to

anyone, however he knows that ESTRIDGE has provided heroin to other people in the past.

      24.     Investigators identified numerous incoming and outgoing telephone calls between

PETERSIMES's cellular telephone number (**203-500-1728**)[3] and ESTRIDGE's cellular

telephone number (**475-238-1383**).[4]  Between December 16, 2017, and December 26, 2017,

---

3 Investigators initially made contact with PETERSIMES by calling cellular phone number 203-500-1728.
PETERSIMES thereafter agreed to meet with investigators in-person.
4 Phone number 475-238-1383, when active, was subscribed in the name of "Timothy Estridge, 391 South Main
Street Wallingford, Connecticut 06492."

PETERSIMES and ESTRIDGE contacted each other approximately 21 times. Between January 25, 2018, and January 26, 2018, PETERSIMES and ESTRIDGE contact each other approximately 11 times. Based on the frequency of telephone calls, along with other aspects of this investigation, there is sufficient evidence to conclude that PETERSIMES and ESTRIDGE were engaged in obtaining, selling, and using heroin, and that records pertaining to the two cellular phone numbers utilized by ESTRIDGE and PETERSIMES will contain evidence of this illegal activity.

FACTS ABOUT CELL TOWERS IN GENERAL

25.     Many cellular service providers maintain antenna towers (cell towers) that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. These cell towers allow the wireless devices to transmit or receive communications, such as phone calls, text messages, and other data. The tower closest to a wireless device does not necessarily serve every call made to or from that device.

26.     In addition to a unique telephone number, each cell phone is identified by one or more unique identifiers. Depending on the cellular network and the device, the unique identifiers for a cell phone could include an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI).

27.     Cellular service providers routinely maintain historical cell-tower log information, including records identifying the wireless telephone calls and communications that used a particular tower. For each communication, these records may include the telephone call number and unique identifiers for the wireless device in the vicinity of the tower that made or received

the communication (referred to as "the locally served wireless device"); the source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device); the date, time, and duration of the communication; the "sectors" (*i.e.*, the faces of the towers) that received a radio signal from the locally served device; and the type of communication transmitted through the tower (such as phone call or text message).

     28.    Based on the above facts, there are reasonable grounds to believe that cellular telephone number **475-238-1383** is associated with ESTRIDGE, that cellular telephone number **203-500-1728** is associated with PETERSIMES, and that the phone records as described in Attachment A for the dates set forth in Attachment B would identify the location of the wireless devices for the dates set forth in Attachment B.  This information, in turn, will assist law enforcement in confirming whether ESTRIDGE and PETERSIMES met and, if so, the approximate locations and frequency of these meetings.

## REQUEST FOR ORDER

29.     The facts set forth in the previous section show that there are reasonable grounds

to believe that the records and other information described in Attachment A for the dates

described in Attachment B are relevant and material to an ongoing criminal investigation.

Specifically, these items will help the United States to identify and locate the individual(s) who

are responsible for the events described above and in Attachment B, and to determine the nature

and scope of their activities.  Accordingly, the United States requests that the Service Providers

be directed to produce all items described in Part II of Attachment A for the dates described in

Attachment B to the proposed Order.


Respectfully submitted,

JOHN DURHAM
UNITED STATES ATTORNEY

NATASHA M. FREISMUTH
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05772
450 Main Street, Room 328
Hartford, CT 06103
(860) 947-1101